## Richmond.

### WRIGHT V. COMMONWEALTH.

1. Under § 12 of ch. 202, C. V. 1873, the court may discharge a jury in any criminal case, *felony* or *misdemeanor*, whenever, in its opinion, they cannot agree on a verdict, or there is a manifest necessity for such discharge, whether the prisoner consents or not. But the discretion exercised in such cases by the trying court may be reviewed by the appellate court.

2. A fight was going on outside of a bar-room, in which prisoner was, between the grandfather of the prisoner and two others; a good many other persons were standing around, but not engaged in the fight. Prisoner, on hearing of the fight, seized a large stick, ran out in the crowd, struck several persons with it, breaking the arm of one, and struck one person, who was not engaged in, or noticing the fight, a blow on the head, from which he died the next day. HELD: Guilty of murder in the *first degree.*

3. The premeditated design to kill need not have existed for any length of time; but if the design at the time of killing was *then* formed, and the killing was done without provocation then or recently received, it is, murder in the first degree.

This was a writ of error to a judgment rendered by the judge of the circuit court of Pittsylvania county, refusing a writ of error to a judgment rendered by the county court of said county, in a prosecution against Dock Wright for the murder of Joseph Coleman Arthur. The facts are fully set out in the opinion of the court, except upon the point of an alleged separation of the jury, which charge was so clearly not established that it is useless to insert the evidence on which it was based.

*Robert H. Tredway,* for the plaintiff in error.

*The Attorney-General,* for the Commonwealth.

CHRISTIAN, J., delivered the opinion of the court.

The plaintiff in error was convicted in the county court of Pittsylvania county of murder in the first degree. On the first trial there was a hung jury, and the jury failing to agree after three days' retirement and consideration, was discharged by the court, and the case continued. Upon the next trial he was convicted of murder in the first degree, and was sentenced by the court to be hanged on the 28th day of October, 1881.

At the second trial the prisoner, by his counsel, took several bills of exceptions to the rulings of the court, and afterwards applied to the Hon. S. G. Whittle, judge of the circuit court of Pittsylvania county, for a writ of error, which was refused by the said circuit judge, and thereupon the prisoner, by his counsel, applied for a writ of error to this court, which was accordingly awarded.

The petition sets forth three grounds of error, which will now be noticed, respectively, though not in the order in which they are presented.

First. That the court erred in sustaining the demurrer of the Commonwealth's attorney to the plea filed by the prisoner at the second trial, which plea, in effect, asserted that the prisoner was once in jeopardy, having been legally and fully put in jeopardy at the former trial, because the jury was discharged without his consent. For this position, the learned counsel relies upon the case of *Williams* v. *The Commonwealth*, 2 Gratt. 568. This case has no application to the case at bar. It declared, it is true, that in a case of felony the court could not discharge the jury without the consent of the accused, merely because the jury could not agree. But this decision was made prior to the passage of the act passed March 4th, 1848, and which has been incorporated in our Code ever since. Prior to the passage of that act, the power of the court to discharge juries upon their non-

agreement was confined to cases of misdemeanors. But by the express terms of that act it is provided, that "in *any* criminal case the court may discharge the jury when it appears they cannot agree in a verdict, or that there is manifest necessity for such discharge." See Code of 1873, p. 1246, § 12; see also *Dye* v. *The Commonwealth*, 7 Gratt. 662.

There can be no question, therefore, of the power of the court, when it became satisfied that the jury could not agree, to withdraw a juror, without any consent on the part of the prisoner, and to discharge the jury and continue the case.

The court is, therefore, of opinion that this assignment of error is not well taken, especially in view of the fact that the prisoner made no objection to such discharge of the jury, and must be presumed to have acquiesced in it. See *Dye's case, supra.*

Of course, a very large discretion must be given to the court of trial in such a matter, subject always to be reviewed by the appellate court, if such discretion is improperly exercised.

In the case before us, the jury was kept together for three days without agreement, and the court certifies it was satisfied the jury could not agree,

We think, therefore, that the provisions of the statute in this case have been fully complied with, and that the court did not err in sustaining the demurrer to the prisoner's plea of "twice in jeopardy."

This disposes of the first assignment of error.

We will now proceed to consider, as more convenient, the third assignment of error, which is, in substance, upon the ground of a separation of the jury and misconduct of some of the jurors. It is sufficient to say that this ground of error is not sustained by the proofs in the case. There was no separation of the jury such as the law recognizes. The juror or jurors who were temporarily absent from their fellow jurymen were always in the presence and custody of

one of the deputy sheriffs.  Nor was there any proof of such misconduct on the part of any of the jurors as would vitiate their verdict.

The court is therefore of opinion that the third assignment of error is not well taken.

The next and last assignment of error is that set forth in the second bill of exceptions, and which is contained in the second assignment of error, as set forth in the petition, to wit:  Because the verdict of the jury was contrary to law and the facts proved.

The bill of exeptions in this case does not simply certify the evidence, but contains a certificate of the facts proved in the case, which certificate is as follows:

" That on the 5th day of February last, at Museville, in Pittsylvania county, between sunset and dark, a quarrel arose between Mastin Adkins, a white, and Joe Minter, a colored man; both of them were under the influence of liquor, and both of them over sixty years of age; that during the quarrel Adkins shoved Minter off the steps of the porch to the store-house, and afterwards, while a few feet from said porch, Adkins struck Minter with his fist and knocked him down twice; that Minter while down turned over on his back and was striking, from that position, Atkins on his legs with his stick; that while Atkins was kicking at Minter and Minter striking at Atkins with his stick, Sam Wright, a colored man and friend of Minter, knocked Atkins with a stick and broke his thumb; that most of the crowd present gathered around where the fight was going on; at the time there were in or about the store twenty-five or thirty people, seven or eight of whom were colored; that Sam Wright had gotten Joe Minter up, and the three were standing scuffling.   Dock Wright, when the difficulty began, was in the store.   A remark was made in said store that a fight was going on outside.   Dock Wright ran out, and as he left the porch of said store he procured and carried in his hands a stick of wood; that he ran to where the fight

was going on with the stick raised aloft, brandishing with both hands and striking right and left; that being told by Saunders Kendrick, a white man and a witness for the Commonwealth, who was looking on at the fight, in a sharp tone, not to strike with that stick, he turned and ran around the crowd, striking at white men right and left; that he came up with the deceased, Joseph Coleman Arthur, a white man, who was on the outskirts of the crowd going towards the store, and who was taking no part or notice of the difficulty, and running around in front of him, and without speaking a word, struck him on the head with the stick and knocked him down; that turning and running around the crowd, striking as he ran, he struck several other white persons severe blows with the stick, breaking the arm of one of them; that none of them so stricken were taking or had taken any part in the fight; that Mastin Atkins, Joe Minter and Sam Wright were the only ones engaged in the difficulty; that having stricken these parties, the prisoner ran off, and was arrested the next morning. The blow which the prisoner inflicted on the deceased, Arthur, fractured his skull near the left temple, and from which blow the said Arthur died about sunrise the next morning. That shortly after the difficulty the prisoner told Cos. Donelly, a colored man whom he met, that he had been knocking the white men about right smartly up at the store. He still had the stick in his hand. The stick was exhibited in court, and identified by the witnesses. It was four and a half feet long, and eight inches in circumference at its largest part. Dock Wright got to Museville that day about an hour before sundown. The prisoner is the grandson of Joe Minter. Joe Minter had a rib fractured by Atkins, and of which he complained for some time. Joe Minter limps when he walks."

We have now to consider whether the facts thus certified constitute murder in the first degree.

The learned counsel for the prisoner endeavors to maintain that the act of the prisoner was without malice or premeditation, and that he could not, therefore, be convicted of murder in the first degree, but upon the strictest construction to be placed upon the evidence, it was a case of murder in the second degree or manslaughter. He maintains that the act was done under a state of excitement, which precludes the idea of premeditated or deliberate and willful murder, which the statute defines to be murder in the first degree.

It is necessary, therefore, for this court to examine the facts and circumstances of the case to ascertain what offence the prisoner has committed, and what degree of criminality marked the offence.

That the prisoner committed the homicide charged in the indictment, there can be no doubt. Was it committed under circumstances which, according to law, make it murder in the second degree or murder in the first degree? To determine whether it be the one or the other offence, it is necessary to refer to and consider the provisions of the statute creating the distinctions between murder of the first and second degree. The words of the statute are as follows:

"Murder by poison, lying in wait, imprisonment, starving, or any willful, deliberate or premeditated killing, or in the commission of or attempt to commit arson, rape, robbery or burglary, is murder of the first degree. All other murder is murder of the second degree."

Here it will be perceived that the legislature have enumerated certain striking instances of deliberate, cruel and premeditated homicide; but finding that a particular enumeration of all the instances which may happen in the ever varying circumstances in which men are placed would be impracticable, they have, by general words, declared that "any willful, deliberate and premeditated killing" shall be murder in the first degree.

That the killing was willful in this case cannot be dis-
puted. The blow was struck by a bludgeon four and a half
feet long and eight inches in circumference, wielded by a
young and strong man, upon the head of his unprotected
victim. It was, therefore, willful. The question is, whether
it was deliberate and premeditated.

It was held by this court, in *Whiteford* v. *The Common-
wealth*, 6 Ran. 721, which case has been followed ever since as
correctly laying down the law of murder, that the premedi-
tated design to kill need not have existed any *particular
length of time*, but if the design at the time of killing was
*then* formed, and the killing was done without provocation
*then* or *recently* received, it is murder in the first degree.
This decision has been followed in many cases. See
*Jones' case*, 1 Leigh. p. 598; *Howell's case*, 26 Gratt. 995;
*Mitchell's case*, 33 Gratt. 872, and cases referred to in these
cases.

Now let us apply these cases construing the statute de-
fining murder in the first degree to the case at bar.

The certified facts show that while the fight was going
on between Atkins and the negro, Joe Minter, the prisoner
was in the store, and upon a remark by some one made in
the store that a fight was going on outside, he ran out,
seized in the porch a stick of wood four and a half feet
long and eight inches in circumference, and ran to where
the fight was going on with the stick raised aloft, brand-
ishing with both hands, and striking right and left; that
being told by Kendrick, a white man, who was looking
on at the fight, not to strike with that stick, he turned
and ran around the crowd, striking at white men right and
left; that he came up with the deceased, Arthur, a white
man, who was on the outskirts of the crowd, and who was
taking *no part or notice* of the difficulty, and running around
in front of him, and without speaking a word, struck him
on the head with this murderous bludgeon and knocked

Wright v. Commonwealth.

him down; that turning and running around the crowd, striking as he ran, he struck several other white persons severe blows with his stick, breaking the arm of one of them; that none of them so stricken were taking or had taken any part in the fight; that Atkins, Joe Minter, and Sam Wright were the ones engaged in the difficulty, and that having stricken these parties, the prisoner ran off, and was arrested next morning. The blow which the prisoner inflicted on the deceased fractured his skull near the left temple, from which blow he died about sunrise next morning.

Upon this state of facts, where a party without provocation deals a death blow to a bystander who had nothing to do with the affray in which the prisoner's grandfather was concerned, who was taking no part or notice of the difficulty between the parties engaged in the conflict, but who was peacefully and quietly going about his business, the party committing such malicious, unprovoked and cruel act is guilty of murder, and of murder in the first degree. In his conduct thus exhibited, he represented the character of a malicious murderer, who is described by a distinguished law writer as one who has "a heart regardless of social duty, and deliberately bent on mischief."

There is not a single circumstance of provocation, excuse or extenuation for his crime. He is guilty of murder, and of murder in the first degree.

We are of opinion that there is no error in the judgment of the county court of Pittsylvania, or in that of the Hon. S. G. Whittle, judge of the circuit court, in refusing a writ of error to the judgment of the said county court, and that the same be affirmed.

JUDGMENT AFFIRMED.